OPINION OF THE COURT
Edward J. McLaughlin, J.
At issue is whether, pursuant to subdivision (b) of section 651 of the Family Court Act, three minor children should be returned to their natural father, or whether they should be allowed to remain with the woman with whom their father left them in the fall of 1974.
*611 The court is afforded an opportunity to apply the rule for such custody disputes established by the Court of Appeals in Matter of Bennett v Jeffreys (40 NY2d 543). This court holds that Matter of Bennett v Jeffreys established a new application of the abandonment concept, which is, that once the circumstance of abandonment, as newly defined, has occurred, that in any future contest over custody, the court shall apply the best interest of the child standard of proof. The Bennett standard is applicable despite the fact that the abandonment has terminated prior to the initiation of the proceeding. The court holds that to interpret Matter of Bennett v Jeffreys (supra) in any other way would effectively render that landmark decision meaningless.
I. FACTS
The father of the children, petitioner herein, and a Janice S. were married on September 26, 1970. The three subject children, Dede Denise, born August 22, 1971, Janice, born September 18, 1972, and Clarence, Jr., born February 7, 1974, are the issue of that union. In the summer of 1974, petitioner removed his children from the marital home because his wife refused to take any responsibility for the children or the household. After a series of temporary arrangements for the care of the children failed, petitioner went to talk with respondent, a woman whom he knew to be a friend of his father’s, about taking care of his children. As respondent understood the conversation, petitioner told her that if she would raise the children, he would let her have them. A few days later he appeared with the children and left them in her care.
In October of 1974, a support order was made by the Family Court of Onondaga County ordering petitioner to pay $30 each week to respondent for the support of the children. Four payments were made between October of 1974 and February of 1975. Subsequently, no other payments were made and no effort was made by the petitioner to reduce the amount of the payments previously ordered. In November of 1974, petitioner executed, with the advice of counsel, a document giving power of attorney to respondent for all matters regarding the children’s welfare.
Petitioner testified that he visited the children once or twice in the fall of 1974, but that he provided them with no clothing, although he did bring them food he obtained from the Salvation Army. He visited them on Christmas in 1974, *612 but he gave them no Christmas gifts, although he was working at that time. From December, 1974 to July, 1975, there was a gap in petitioner’s relationship with his children.
In July of 1975, the child, Janice, was found to be seriously ill with a possible brain tumor. The doctor advised that it was necessary for her to undergo neurosurgery. The doctor told respondent that because of the seriousness of the medical procedure, petitioner’s written consent must be obtained before he would operate. Respondent volunteered to find petitioner.
Since she had not heard from petitioner in some time, respondent had difficulty in locating him, but she finally found him. She told him of Janice’s serious medical problem. He told her that if, "Janice is going to die, she’s going to die”. He did not sign the consent form. Respondent’s consent was then accepted by the hospital, since time was critical. Respondent visited Janice every day from July 31, 1975, when Janice was admitted to the hospital, until September 19, 1975, when she was discharged. Petitioner did go to the hospital once or twice to visit Janice. He did not, however, although he was asked to do so, babysit with the other children or help respondent with the added burdens of caring for a child recovering from brain surgery, nor did he visit the other children during Janice’s hospitalization. He came to respondent’s home, however, the day after Janice was released from the hospital and brought a half gallon of ice cream, which he ate himself. Petitioner was not seen for about a year after the day that Janice came home from the hospital.
After Janice’s surgery for the brain tumor, it was necessary for her to have a ventriculo-peritoneal shunt inserted. Janice still has the shunt and must be carefully watched so that she does not hit her head. Also, Janice was found to have a moderate case of lead poisoning in November of 1974, which has affected her learning abilities.
The Department of Social Services has been involved with the case of these children since 1974. In July of 1974, a neglect petition was brought. By stipulation, the petition was withdrawn on condition that the children be cared for by respondent. The stipulation was never made into an order of the court. A permanent neglect petition was filed by the Department of Social Services due to improper service upon petitioner after he brought on a motion to vacate the order in early 1977.
*613 In October of 1977, petitioner obtained a divorce from the mother of the children on the grounds of her abandonment. He subsequently married and has a new baby. The child of his present wife’s former marriage also lives with him. The child is hyperactive and requires special attention. In December of 1977, petitioner began the present proceeding to gain custody of the three subject children.
II. LAW
A. Abandonment — an extraordinary circumstance.
In the landmark decision of Matter of Bennett v Jeffreys (40 NY2d 543, supra) the Court of Appeals established a new standard of proof for use in custody cases. (See Matter of Robertson v Robertson, 54 AD2d 1081.) The court (supra, p 549) there held that in a custody proceeding "intervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child. It is only on such a premise that the courts may then proceed to inquire into the best interest of the child and to order a custodial disposition on that ground.” Thus, once one of the enumerated extraordinary events is found to have occurred, although such an extraordinary event may have taken place in the past and may not be the current situation, the best interest test is triggered and will determine the future custody of the child. Thus, a custody proceeding is unlike a neglect proceeding where the neglect must be current. (Matter of Daniel C., 47 AD2d 160.)
Further, there is a distinction between custody proceedings and termination of parental rights proceedings, which is not without significance. In a permanent neglect proceeding, a finding of surrender, abandonment, unfitness, persistent neglect, or an unfortunate or involuntary extended disruption of custody results in a permanent change in the legal rights of the parties. In a custody proceeding, however, a finding of surrender, abandonment, unfitness, persistent neglect, or an unfortunate or involuntary extended disruption of custody merely triggers the best interest test — no legal rights of any of the parties are necessarily disturbed.
The elements that constitute abandonment under Matter of Bennett v Jeffreys (40 NY2d 543, supra) in a custody proceed *614 ing, then, may be less crystal clear in all respects than must be the manifest intention and action required by a party to establish abandonment in a termination of parental rights proceeding. In essence, the standard of abandonment in a custody case may be passive, while the standard of abandonment in a case of termination of parental rights must be active.
Holdings of the Court of Appeals in cases of termination of parental rights highlight this distinction in the use of the word abandonment. For example, if a "flicker of interest” exists on the part of a parent, a court is not free to permanently extinguish the parental rights of the party who has demonstrated such an interest. (Matter of Susan W. v Talbot G., 34 NY2d 76.) Similarly, abandonment that frees a child for adoption "relates to such conduct on the part of a parent as evinces a purposeful ridding of parental obligations and the foregoing of parental rights — a withdrawing of interest, presence, affection, care and support.” (Matter of Cory L. v Martin L., 45 NY2d 383, 391.)
Confusion also surrounds the statutory use of the term abandonment, for it is a single term used variously in different sections of New York law. For instance, under the permanent neglect provisions of article 6 of the Family Court Act, a child is found to be permanently neglected when a parent abandons a child placed with an authorized agency by failing to maintain contact with the child or to plan for its future for one year. (Family Ct Act, §§ 611, 614.) Under the Penal Law, a person abandons a child when he deserts a child under 14 in any place with intent to wholly abandon it. (Penal Law, § 260.00.) Under section 111 (subd 2, par [a]) of the Domestic Relations Law, the consent of a natural parent to an adoption is not required when the parent evinces an intent to forego his or her parental or custodial rights and obligations as manifested by his or her failure to visit the child or communicate with the child or person having legal custody of the child, although able to do so for a period of six months. (See Matter of Susan W. v Talbot G., 34 NY2d 76, supra.) Under section 384-b (subd 4, par [b]; subd 5, par [a]) of the Social Services Law, a child is abandoned by his parent if such parent evinces an intent to forego his or her parental rights and obligations by his of her failure to visit the child and communicate with the child or agency, although able to do so and not prevented or discouraged from so doing by the agency for a period of six *615 months immediately prior to the initiation of the proceeding. Thus, in the statutory law, as in case law, the term abandonment is a term of art which is applied differently in different situations.
Accordingly, this court finds that petitioner abandoned his children during 1975 as the term abandonment is defined in Matter of Bennett v Jeffreys (40 NY2d 543, supra). The court makes this finding despite petitioner’s visit to Janice once during that period. Further, his present regular visits to the children do not abrogate his past abandonment. Petitioner’s abandonment resulted in an unfortunate extended disruption of his custody of the children, a disruption voluntarily created by himself. The combination of his abandonment of his children and of his disruption of the custody of his children create an extraordinary circumstance of the rare nature set forth in Matter of Bennett v Jeffreys (supra).
It should be noted that this court does not find petitioner to be an unfit parent, in that he is not a drunkard, an incompetent, or a notoriously immoral person. (Matter of Gustow, 220 NY 373, 377.) Nor does he suffer from any physical defect that would impair his abilities as a parent. (Rodriguez v Dumpson, 52 AD2d 299.) However, having made a finding of abandonment of the extraordinary nature articulated in Matter of Bennett v Jeffreys (supra) the court must apply the best interest of the child test to determine future custody of the children.
B. Best interest of the child test.
"The child’s 'best interest’ is not controlled by whether the natural parent or the nonparent would make a 'better’ parent, or by whether the parent or the nonparent would afford the child a 'better’ background or superior creature comforts. Nor is the child’s best interest controlled alone by comparing the depth of love and affection between the child and those who vie for its custody. Instead, in ascertaining the child’s best interest, the court is guided by principles which reflect a 'considered social judgment in this society respecting the family and parenthood’.” (Matter of Bennett v Jeffreys, 40 NY2d 543, 549, supra.) Psychological relationships as well as physical relationships must be considered. (Matter of Patricia A., 89 Misc 2d 368.) The court should also consider the quality of the relationship the child has with the natural parent and the foster parent, the natural parent’s ability to care and plan for the future of the child, the mental health of all parties, *616 and the child’s current education and social situation. (Matter of Lamond B., 64 AD2d 625.) An in depth development of facts in such cases must be made during the proceedings before the trial court. (People ex rel. Wilson v Wilson, 56 AD2d 794; Matter of Irene O., 38 NY2d 776; Matter of William DD v Rose M. DD, 55 AD2d 976.)
During the trial of this matter, expert testimony of a child psychologist was offered. He had five meetings with various combinations of interested persons — he saw all three children together, he talked with respondent and the friend who is often at her home, he talked to petitioner, he talked with each of the children individually and he talked with the children and respondent and her friend together. He concluded that respondent is the psychological parent of the children. There is a deep bonding between respondent and the children. He expressed his opinion that if the children were removed from respondent it would be difficult for them ever to bond with anyone in their future life. Further, a pediatric caseworker testified that the child, Janice, called for respondent when she was in the critical life-threatening trauma of neurosurgery. The probation report made no custody recommendation. The probation report did, however, express a concern about taking the children from a home that appears to be organized and secure and putting them into a totally new situation. The Department of Social Services caseworker who investigated both possible placements found both respondent and petitioner to be suitable custodians and made no recommendation for placement with either person.
If petitioner were given custody of his three children, his new family would consist of Dede, Janice, the child with a shunt in her head that must not be hit and who has learning problems, and Clarence, plus Bobby, petitioner’s present wife’s child of a former marriage, who is hyperactive, and a new baby, the child of petitioner and his present wife. Further, the present wife of petitioner and her son Bobby are white. Dede, Janice and Clarence, Jr., are Black. The new baby is biracial. Petitioner and respondent are both Black. While this court does not find that the fact of the present wife of petitioner’s race is significant, it notes the social implications of such a family situation and its potential impact on the children. (See Raysor v Gabbey, 57 AD2d 437; Matter of B., 89 Misc 2d 493.) In March, when the probation report was filed, petitioner had no job and his wife was working in a gas station. Given the *617 extraordinary needs of Janice and Bobby, great strain would be put on an established family unit to care for the children— the burden on a fledgling family unit, where three of the members are in a completely new setting, defies the imagination.
The children’s natural mother was personally served with a notice of these proceedings. She was also aware of them through a conversation she had with respondent during the proceedings. She did not appear in court and expressed no interest in the outcome of the custody hearing.
Respondent has completed a Red Cross course in programmed home nursing and is a certified home aide, employed by Home Aides of Central New York, Inc. The children have lived with her since 1974, and consider her home their home. Everyone agrees that the children have received excellent care under respondent’s tutelage.* Continuing custody of the children with the respondent would be in the best interests of the children.
This court, therefore, dismisses the subject petition and continues custody with respondent. Further, petitioner shall have reasonable rights of visitation, consistent with the best interests of the children.

 In a case where a natural father had provided no support for his children and showed little interest in their welfare prior to bringing a habeas corpus proceeding, the Court of Appeals found the children to be abandoned, and left the children in the custody of the respondent nonparent. (Matter of Benning v Benning, 303 NY 775.) In another case where a nonrelative had been the de facto guardian of a child since birth, the court awarded custody to the guardian and granted the natural father liberal visitation rights. (Colon v Carrion, NYU, May 20, 1971, p 16, col 5.)