# In the Matter of Wesley L., III. Talbot Perkins Children's Services, Respondent; Betty W. et al., Appellants.

First Department, January 3, 1980

138

**APPEARANCES OF COUNSEL**

*Helena Pichel Solleder* for appellants.

*Terry Milburn* for respondent.

**OPINION OF THE COURT**

LUPIANO, J.

This is an appeal from an order of commitment entered after a hearing and a decision which held that the parents had abandoned their child under section 384 of the Social Services Law and committed custody and guardianship to the Commissioner of Social Services of the City of New York, and authorized petitioner Talbot Perkins Children's Services to consent to the adoption of the minor Wesley L., III.

At the hearing on April 27, 1977, the following testimony and evidence were elicited: Ms. Zunz, foster care supervisor for the agency, stated that the child Wesley, born on July 23, 1973, came into the care of the agency in August, 1973, having been so referred by the Department of Social Services because the child was born with tremors and irritability and it was suspected that the mother was a drug user. On December 19, 1973, the child was discharged to the mother but was returned to the care of the agency in January of 1974, the mother signing a voluntary authorization for placement of the child on January 10. On February 14, 1974, the mother visited the child at the agency. On March 29 of that year the parents visited the child at the agency and requested return of the child. They agreed to secure a report from the drug program which they had attended. On April 30, 1974, the mother visited the agency to see her child, but the foster mother was unable to bring the child. On May 13, 1974, the mother went to the agency for a reunion, but the foster mother did not bring the child because the natural mother was late in confirming the appointment. On August 5, 1974, the natural parents were late in arriving at the agency for a reunion with

Wesley and discovered that the foster mother had already left with the child. On August 23 the parents had a reunion with the child. On September 16, the mother had a reunion with the child. On October 10, the parents appeared at the agency relevant to the mother being apparently successful in curing her drug addiction at the Martin Luther King Clinic. On October 28, 1974, the parents had a reunion with the child. On January 31, 1975, the mother was interviewed at the agency regarding the present state of her effort to rehabilitate herself in regard to her drug addiction. There were visits by the parents at the agency (the child not being present because he resided in a foster home) on February 5, 1975 and in May, 1975, at which time they continued to evince an intent to take the child back. In September of 1975, the parents had a second child, who apparently exhibited the same withdrawal symptoms as had Wesley· at birth, and the agency was contacted by the Department of Social Services (Bureau of Child Welfare). Nevertheless, the second child, Richard, was discharged to the parents in October of 1975, pursuant to a decision of the Bureau of Child Welfare and has since continuously resided with the parents.

The petition herein was filed in April of 1976, and the court allowed testimony as to visits subsequent to the filing.

On November 24, 1976, after conference with the Surrogate, the parents attended a reunion with Wesley, at which time Wesley's younger brother Richard was present. On December 10, Ms. Alleyne, a caseworker, visited the parents' home and found it to be a clean and simply furnished, two-bedroom Bronx apartment. The second bedroom was occupied by Richard, but would be shared by Wesley on visits to the home. On December 26, 1976, the father formally acknowledged paternity of Wesley, as he had theretofore informally promised, and the parents took the child home for Christmas vacation until December 28, 1976. Arrangements were made by the parents for an overnight visit by Wesley at their home to take place on January 7, 1977. However, this visit did not occur due to a sudden change in the parents' plans. From February 9 to February 17, 1977, Wesley was permitted to visit his parents and they returned him to the agency without any adverse incident occurring. From March 16 to March 25, 1977, Wesley had another home visit. Ms. Alleyne declared that upon return to the agency after the March, 1977 home visit, Wesley had a bandage on his leg from a scratch "where mommy hit

me" and a bruise on his hand "where daddy hit me." She further testified that on March 24, 1977, the parents were instructed to go to a clinic and be tested to ascertain if they were free of their addiction. Mr. L., the father, produced a letter regarding the parents' drug status ostensibly given by a drug rehabilitation clinic. The letter is a patent forgery and contains misspelling of the most simple words; it would not fool any reasonably educated person. While it reflects unfavorably on the father for attempting to practice a falsehood on the agency, it also may be viewed as a pathetic act indicative of the strong desire of the natural parents to retain a bond with Wesley. While the measure thus undertaken is not laudable, it patently emanates from the desire of the natural parents to obtain custody of their son, a desire which has its impetus in the love of a parent for a child. At this point the agency refused to permit any further visits, despite the parents' request for same.

Wesley's mother explained that the scratch was the result of his attempt to escape a spanking for hitting his younger brother, Richard, a habit of Wesley's of which the mother had complained to a caseworker after an earlier visit.

The Surrogate in his decision stated, relevant to the parents' drug problem: "In August (1974), the agency received a letter from the parents' drug program saying that they were not rehabilitated, though they had attended the program during the last two months of 1973. The parents then claimed that they did not need a drug program as they were drug free. The agency asked for proof that they were drug free, but none was supplied." Scrutiny of the Surrogate's decision discloses a proper concern for the best interests of the child and as a general proposition the decision may not be faulted. However, two factors give pause to the judicial operation which would sever the natural parent-child bond under the laws of the State of New York. They are: (1) the statement in the decision that the "parents have not evidenced sufficient parental interest in their child", and (2) the failure of the court to mention in any manner the detailed and thoughtful report of the guardian ad litem appointed for the child Wesley and the similarly detailed report of the guardian ad litem appointed to represent the natural parents.

■ Contrary to an assertion made by petitioner in its brief on appeal, the separation of siblings is a factor to be considered in determining what is in the best interest of a child (cf.

*Matter of Malik M.,* 40 NY2d 840, 841). Similarly, it is well recognized that consideration should be given to the report and recommendation of the guardian ad litem appointed for the child as he is the child's advocate (see *Matter of Ray A. M.,* 37 NY2d 619, 624; cf. *Matter of Orlando F.,* 40 NY2d 103, 112). The guardian ad litem for the child states his opinion that while the facts disclose abandonment for a period of more than six months prior to the filing of the petition, section 384 of the Social Services Law "does not require that upon (such finding) the Surrogate commit the custody and guardianship of the * * * child to the petitioning authorized agency. Rather, such power is discretionary with the Surrogate. Accordingly, I find that my ward's best interests would be served by following recommendations resulting from a full scale, independent investigation into the fitness of his parents as if this were a custody proceeding, and thus, I respectfully recommend the same. I do not feel that the petitioner's investigation clearly indicates that the relief prayed for is in my ward's best interest."

Admittedly, for a year after the birth of the second child little or no contact was maintained by the parents with Wesley. However, subsequent to that period, the parents have exhibited a continuous interest in maintaining such contact and in having Wesley ultimately returned to their family unit. What apparently is the stumbling block is the present state of their drug addiction. It is undisputed that the natural parents have resided together for many years and that the father is employed full time. The family environment does not give evidence of instability, apart from the issue of the natural parents' present drug addiction.

The guardian ad litem for the parents pertinently points out in his report "that in the agency's transfer summary memorandum dated April 26, 1977 it is noted that the infant is having problems; that the foster mother is distant towards the child and is not interested in adoption. If this be so, the petitioner or another agency will still be required to continue foster care." The guardian ad litem for the parents, echoing the plea of the guardian ad litem for the child, recommended dismissal of the petition for commitment without prejudice to further application at the end of four or six months, and that during this interval the petitioner agency or such other agency as the court may designate "carefully monitor and investigate the parents continuing conduct with and concern-

ing the child as well as the parents' fitness to have the custody of the child restored to them at the end of such extended period; that a further report be given to [the] [c]ourt so that it can then be determined whether it then appears to be in the child's best interest and welfare to restore the child to the parents' custody or terminate the parents' rights and commit the child for adoption."

Parenthetically, reading of the transcript of the hearing on April 27, 1977 before the Surrogate discloses that the natural father, apparently in an effort to escape addiction to heroin, resorted to Methodone and was presently undergoing a course of treatment to be relieved of addiction to the latter substance. If so, then such activity, undertaken in the context of establishing fitness to obtain the return of Wesley, is most laudable. The difficulty of withdrawing from and denying to one's self the drug to which one is addicted cannot be underestimated. Motivation and courage are required to succeed in overcoming an addiction to drugs, and insofar as that motivation and courage proceed not only out of self-interest, but in response to a parent's love for his child, they generate compassion and respect. To those who do not have the "monkey" of drug addiction "on their backs," the reality of the effort of will and physical endurance required to take that "monkey off one's back" is sometimes underestimated and not accorded the reasoned and dispassionate recognition that undertaking such effort is itself laudable, and intermittent failure should be held of little or no account provided the process of self-rehabilitation is not abandoned as hopeless.

What is at stake here is the destiny, the future of the child Wesley, and it is under this reality that the maxim of "the best interests of the child" controls. In the entire transcript of the hearing there is only one statement presented relevant to the issue of whether Wesley faces the probability of being adopted rather than relegated to a life of residing in a foster home or a succession of foster homes. That statement issued from Ms. Zunz in response to the inquiry "And is Wesley an adoptable child?" to which she responded "Yes, I believe so." Wesley is now over six years old and the probability of his being adopted is not demonstrated by this record to be good. The reality that Wesley may simply be consigned to foster home status should be kept in mind. Indeed, it is the appreciation of the fact that Wesley's one chance for a real, not a foster home, may reside only with his natural parents, that

prompted the recommendations of the guardian ad litem herein.

■ Mindful of the spirit underlying application of the rule requiring that the child's best interest be served, of the fact that the child is a ward of the court and the strength usually, though not necessarily emanating from the fact of parentage, it is requisite on this record that, as a matter of law, severance of the bond between the natural parents and Wesley be stayed so as to afford a full, complete and sensitive investigation aimed at determining whether the best interest of Wesley requires that he be returned to the home of his natural parents and his younger brother.

I entertain grave doubt as to the propriety of determining *on this record* an abandonment of the child by the parents, having, *inter alia,* regard for the explanation of the natural mother at the hearing.[1]

The mere absence of visitation or contact with Wesley for a period of six months preceding the hearing is in itself insufficient to establish abandonment. Inquiry must be made into the question of whether the failure occurred without good reason (see *Matter of Angel Guardian Home v Mendez,* 60 AD2d 600). Further, where the period of nonvisitation occurs in a context of otherwise uninterrrupted contacts between the child and the natural parents and endeavors on the parents' part to obtain return of the child, which contacts and endeavors both precede and succeed the period of nonvisitation, a strong showing of active abandonment is required. In the context of the record herein, the mother's explanation for nonvisitation rings "true." Apart from this explanation, the fact remains that to effect a permanent change in the legal rights of the parties in a termination of parental rights proceeding (such as the instant matter), as compared or contrasted with a custody proceeding, the standard of abandonment must be active (see *Matter of Dickson v Lascaris,* 97 Misc 2d 610, 614).[2] The abandonment herein was merely

1. The natural mother testified with respect to the period in which she failed to see her son: "I don't have an explanation, but all I can say is that each time I did go to visit my son, it hurts me to see my son being taken back home with another woman, which I bear the child. And every time I see him, I have to—it hurted me deep down inside. So that's one of the reasons why I did not go back—one of the reasons why I did not go back, because it hurt me to see my child being taken back by somebody else."

2. The court in *Matter of Dickson* perspicaciously observed (p 614): "Holdings of the Court of Appeals in cases of termination of parental rights highlight this distinction

passive, and on this record may not justify a permanent change in the legal relationship between Wesley and his natural parents, i.e., a severing of the parent-child bond.

Even *assuming* abandonment to have occurred and in accordance with the recommendations of the guardians ad litem and on the record herein, it is clear that, as a matter of law, the exercise of discretion in finally severing the parent-child bond and empowering the Talbot Perkins Children's Services agency to consent to the adoption of Wesley was an abuse as being not in the best interests of Wesley.

While the finding of abandonment arising from that one period in which the parents did not maintain contact with Wesley results in forfeiture of their "rights," the issue of who could do an adequate "job" of raising the child still remains, i.e., making a disposition that is in the best interest of the child (see *Matter of Bennett v Jeffreys,* 40 NY2d 543, 548).

Zeal in the application of abstract principles in this area of the law requiring delicate sensibility to the reality underlying the best interest of the child tenet is a danger to be avoided. It is the specter of such zeal which permeates the record herein and gives force to the reasoned conclusion that a new hearing, after full and impartial investigation, is warranted on the issue of the disposition of Wesley. As aptly noted by the Court of Appeals in *Matter of Bennett v Jeffreys (supra,* at pp 551-552): "a new hearing is required because the Family Court did not examine enough into the qualifications and background of the long-time custodian, and the Appellate Division did not require further examination into the qualifications and background of the mother. Each court was excessive in applying abstract principles, a failing, however important those principles are * * * In all of this troublesome and troubled area there is a fundamental principle. Neither law, nor policy, nor the tenets of our society would allow a child to be separated by officials of the State from its parents unless the circumstances are compelling. Neither the lawyers nor Judges in the judicial system nor the experts in psychology or social welfare may displace the primary responsibility of child-raising that

in the use of the word abandonment. For example, if a 'flicker of interest' exists on the part of a parent, a court is not free to permanently extinguish the parental rights of the party who had demonstrated such an interest. *(Matter of Susan W. v Talbot G.,* 34 NY2d 76.)* Similarly, abandonment that frees a child for adoption 'relates to such conduct on the part of a parent as evinces a purposeful ridding of parental obligations and the foregoing of parental rights—a withdrawing of interest, presence, affection, care and support.' *(Matter of Cory L. v Martin L.,* 45 NY2d 383, 391.)"

naturally and legally falls to those who conceive and bear children. Again, this is not so much because it is their 'right', but because it is their responsibility. The nature of human relationships suggests overall the natural workings of the child-rearing process as the most desirable alternative. But absolute generalizations do not fulfill themselves and multifold exceptions give rise to cases where the natural workings of the process fail, not so much because a legal right has been lost, but because the best interest of the child dictates a finding of failure."

Accordingly, the order of commitment of the Surrogate's Court, New York County (MIDONICK, S.), entered October 12, 1977, which held that the parents had abandoned their child under section 384 of the Social Services Law and which committed custody and guardianship to the Talbot Perkins Children's Services and authorized that agency to consent to the adoption of the minor, should be reversed, on the law, without costs, and the matter remanded to the Surrogate's Court for a full investigation in accordance with the aforesaid.

SANDLER, J. P., BLOOM, MARKEWICH and SILVERMAN, JJ., concur.

Order, Surrogate's Court, New York County, entered on October 12, 1977, reversed, on the law, without costs and without disbursements, and the matter remanded to the Surrogate's Court for a full investigation in accordance with the opinion of this court filed herein.