OPINION OF THE COURT
Stanley Gartenstein, J.
To all the “horror stories” of the foster care system which have recently surfaced must now be added the frightening matter at bar. What is most disturbing, more so than had this matter involved out-and-out deceit or overreaching, is the fact that the trampling of one mother’s rights to her own child results here from the uninspired application of standard social work platitudes which so often reinforce the sad but crushing reality that, all things being equal, the poor and disenfranchised have less of a chance to keep their own children than the “haves” or the affluent. The bottom line, therefore, is not that one mother has been abused, which is bad enough, but that the potential for repetition of this terrible injustice is indigenous to the *288 entire system. The Legislature must in some manner face its responsibilty of overhauling the entire foster care system toward the end of eliminating this shame of our society.
THE FACTS
Catherine Linda M., just short of her 21st birthday at the time this proceeding was heard, is the mother of Tricia Lashawnda M., now six. This proceeding seeks to terminate her parental rights so that the subject infant may be adopted.
This is not the first time this court (or this Judge, for that matter) has been called upon to adjudicate a matter involving Catherine Linda M. In 1975, this very same young woman was herself adjudicated a neglected child and placed, prior to her 14th birthday, with the Commissioner of Social Services for shelter care. The commissioner designated as his subcontractor to discharge his responsibility for her care, the Brooklyn Home for Children, the very same agency which now seeks, in this proceeding, to terminate her parental rights. On January 2, 1976, when Catherine Linda was not yet in placement as a neglected child for an entire year, she herself gave birth to a child, the infant in question. It is uncontested that upon being wheeled out of the delivery room, less than a half hour after she regained consciousness, and while still under the effects of the anesthetic, she was given a paper to sign by her own social worker. This paper, signed under these highly questionable circumstances, was a “consent” instrument by virtue of which her own baby was taken from her by the very agency whose ward she was. Following a series of lightning quick maneuvers, Catherine Linda found herself no longer under the care of this agency which had now conveniently taken over her own child as its ward to her own exclusion. This sophisticated scheme was complete even before Catherine Linda reached her 15th birthday. It is further uncontested that there do in fact exist facilities at which a young mother and her child can reside together where parenting skills may be learned and reinforced, but because this particular agency did not have such facilities, it chose instead, to separate mother and child, keeping the child as an adoptable infant and relegating the mother to *289 other unsatisfactory facilities under the auspices of the Commissioner of Social Services, rather than requesting the commissioner to find appropriate other facilities for both of them. Faced with the agency’s protestations of its good faith intentions to the effect that it had always planned for the reunion of mother and daughter, the court is constrained to note that in the very first foster care review in this court (Social Services Law, § 392), it was already conceded that the plans for the infant were always and will continue to be adoption.[2]
With the very agency to whom Catherine Linda was to look, as a matter of law, for guidance and protection, thus acting against her interests, this 15 year old was somehow supposed to undertake a course of visiting her child sufficiently to forestall this abandonment proceeding grounded upon her alleged failure to visit. This at a time when the Commissioner of Social Services who subcontracted with the agency in question for the care of her infant, was the same commissioner charged with her own care and serving her needs which obviously included these crucial visits with her child.
Catherine Linda ceased being a ward of the Commissioner of Social Services in November, 1979. She was and still is a public charge, still the responsibility of the very same commissioner who was charged with protecting her interests when she was his ward, and the very same commissioner who must sanction this proceeding by his subcontract, the petitioning child care agency, for all intents and purposes, his alter ego.
THE EVIDENCE
It is uncontested that respondent visited her child on 11 separate occasions between May 21, 1976 and January 16, 1979. Sometime prior to the last of these dates, the Commissioner of Social Services transferred her to a so-called “diagnostic” facility which, under the best of conditions, could be considered either as a dumping ground for an unwanted juvenile with special needs; or an effort, after *290 being responsible for her more than three years, to belatedly learn something about these needs. She remained here for three months and was discharged in November, 1978 when the commissioner moved her to the St. Lawrence Group Home in The Bronx. This in the face of his responsibility not to discourage visitation (Social Services Law, § 384-b, subd 5, par [a]) and the fact that her own baby was in a foster home in Kings County. Following this, the commissioner saw fit to transfer her, within a short interval, to two other group homes. His dismal failure with her ended in November, 1979 when she reached 18.
Respondent was given an appointment on January 7, 1980 to discuss the future of her child, by letter from the agency which was returned marked “addressee unknown”. Despite the fact that the commissioner had respondent’s address in his files as a recipient of public assistance, the agency chose to ignore this knowledge as well as the fact of life that mail to ghetto neighborhoods has at best a tenuous chance of being delivered. The agency admits that respondent called on May 12,1980 to request visitation; somehow this appointment was not kept. It also concedes that although respondent was enrolled at Project Return, a drug treatment facility, it made absolutely no effort to integrate this fact into a planning conference with her.
On September 5, 1980, by unilateral action of the agency, the caseworker broke off all contact with respondent. It is conceded that the agency did not have the faintest glimmer of knowledge as to how respondent supported herself despite the fact that the same commissioner has responsibility for administering her public assistance and for the care of her child now in issue. Exactly one month prior to the agency’s unilateral action, respondent called the caseworker for an appointment to see her child and gave the worker her address in order to facilitate future contacts. The agency relies on the six-month period immediately preceding February, 1981 to establish abandonment.
respondent’s personal history
At this juncture, it is important to reconstruct portions of this very special young woman’s life and chronicle her *291 efforts to get up every time life knocked her down. Catherine Linda M. now lives in a two- and one-half room apartment owned by the City of New York. She has received public assistance for the past one and one-half years. For a period of time, she drifted into drug use. Her criminal court “rap-sheet” shows six arrests, one of which resulted in her being placed on probation under the supervision of a probation officer whose influence can only be characterized as a fortunate accident of personal chemistry. Miss M. maintained voluntary contact with this officer for months after the criminal courts terminated her probation favorably. In the face of testimony on record to the effect that the caseworker refused to let her see her baby when she tried to set up visitation, claiming that she had “no time” or “is busy”, it was only through the official intervention of Miss M.’s probation officer that she saw her child at all during 1980. On other occasions she appeared for visitation and the child was not there. Miss M. was never permitted to see her child at the foster home but instead had to content herself with appearing at the agency. Despite every possible obstacle placed in her way, respondent last saw her child at the foster home on January 3, 1982. The child knows Miss M. as her mother. On the last visit, respondent brought her a doll and dungarees for her birthday.
Miss M.’s efforts to become a useful member of society evince a sustained drive to put her life together and a sole overriding goal of getting back to her child and being a full-time mother. In 1978, she completed the “Y.E.P.” program successfully and trained on a job, but the program could not place her. After that she took six months of secretarial on-the-job instruction through a program known as Boy’s Harbor only to lose out when its funding ran out. She spent another seven-month training period at the Montreal Community Associates where she typed, interviewed applicants for jobs and answered the phone. At the same time, she was in regular attendance at an ex-offender program known as Private Concerns, Inc., which lost its funding in September, 1980. She then completed Project Green Hope, but failed a qualifying typing test and was encouraged to try again. She has also completed six months of training in the so-called GEP program located in *292 the New York State Harlem Office Building learning typing and filing, but unfortunately failed this test too. She has been active in Harlem Interface, where she took a two-month secretarial program but has been unsuccessful in getting placed. She worked at a Burger King from March, 1981 through July, 1981.
At present, Miss M. continues her efforts at self-sufficiency. She is enrolled in the HCI’s remedial program under G.E.D. auspices trying to sharpen her skills to pass her tests the next time they are given. In three to four months, she expects to be in a job program and will voluntarily remove herself from the welfare rolls. This determined young woman who was addicted to heroin between October, 1978 and February, 1981 has “de-taxed” herself, refusing to go the easy route of methadone maintenance, insisting instead on total withdrawal. She has done this all alone without the crutch of a program and has been drug free for almost a full year. She reinforces her self-motivated drive by faithful attendance at therapy sessions at Harlem Interface. Her therapist was named on the record.
What stands out graphically is that Miss M. has found and joined these programs by herself. Not one person has lifted a finger to help her other than her criminal court probation officer, least of all, the commissioner and the petitioning agency.
Miss M. and her child know each other. The child expects to go home with Miss M. and is excited over the prospect.
The Law Guardian, a concerned and competent attorney with years of experience at the Bar, vigorously opposes termination and has gone as far as moving to dismiss both on the prima facie case and on the entire record.
THE STATUTES AND UNDERLYING PUBLIC POLICY
The concept of termination of parental rights is purely a creature of statute (Social Services Law, § 384-b et seq.) totally nonexistent at common law. Enactment of New York’s termination statutes therefore Was a legislative response to the blight upon an affluent society beneath which existed an invisible subclass of disenfranchised and rootless persons whose children were doomed to a continu *293 pus round of temporary homes supported by the public fisc. This class of children became, by virtue of a legislative statement of public policy, a special class protected by laws aimed at bringing some stability, perhaps security, into their lives by integrating them into a new unit designated as an adoptive family. While judicial and social philosophies at both ends of the spectrum shift with changing times and mores, the basic bifurcated problem remains the same: (A) How may a child’s future security be safeguarded by society’s response to parental indifference? (B) How are we to measure the existence of this indifference in the context of societal intervention? As we struggle judicially with these insoluble yet urgent problems, the formidable shadow of constitutionality hovers in the background. In essence, every statutory enactment by any of the separate States must measure up to the Supreme Court’s justifiable zeal to safeguard the integrity of the family. This unit may not be invaded constitutionally in the absence of overriding factors simply to impose a court’s subjective value judgment that some other unit might provide something tangible or intangible which may not be available through the natural family. As articulated by the Second Circuit Court of Appeals in Duchesne v Sugarman (566 F2d 817, 827-828):
“This action and the continued separation of the family by retention of custody was based on a unilateral and untested evaluation of the mother’s fitness as a parent. As Justice Stewart has very recently stated:
“ Tf a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children’s best interest, I should have little doubt that the State would have intruded impermissibly on “the private realm of family life which the state cannot enter.” Prince v. Massachusetts, 328 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645.’
“Organization of Foster Families, supra, 431 U.S. at 862, 97 S.Ct. at 2119 (Stewart, J., concurring).”
*294 In Stanley v Illinois (405 US 645, 651), the Supreme Court of the United States underscored the constitutionally protected importance of the family unit: “The rights to conceive and to raise one’s children have been deemed ‘essential,’ Meyer v. Nebraska, 262 U.S. 390, 399 (1923), ‘basic civil rights of man,’ Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and ‘[r]ights far more precious * * * than property rights,’ May v. Anderson, 345 U.S. 528, 533 (1953) * * * The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399”.
It is in this context of constitutionality[3] that we must apply New York’s termination statutes. Before doing so, it is necessary that we examine the declarations of public policy made by the Legislature which define those ideals whose realization motivated these enactments within this constitutional framework. These are contained in the introductory text of section 384-b of the Social Services Law:
“1. Statement of legislative findings and intent.
“(a) The legislature hereby finds that:
“(i) it is desirable for children to grow up with a normal family life in a permanent home and that such circumstance offers the best opportunity for children to develop and thrive;
“(ii) it is generally desirable for the child to remain with or be returned to the natural parent because the child’s need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered; *295 “(iii) the state’s first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home”.
The realization of this public policy has not been an easy matter. A feeling of malaise that the foster care agencies are unregulated and self-serving appears to hover over legislative deliberations aimed at remedying the failures of the system. Commenting on opposition to a legislative proposal now before the State’s Temporary Commission to Recodify the Family Court Act which would judicially monitor placements from their very inception, one Family Court Judge has testified that the opposition, “which comes largely from the City’s Department of Social Services is ‘based on one obvious emotion — fear: the fear that fewer children may be left to financially support the foster care system, the fear that the inefficiencies and incompetence of the system will become even better known than they are now’ ”. (Testimony of Judge Leah R. Marks, New York Times, March 21, 1982, p 37.) Whether or not one agrees with these remarks, it is a sad reality that fully one fifth of the children in foster care in the United States are from New York; and o£the State’s 40,000 children in foster care, almost 20,000 are from New York City. As pointed out by the Honorable Carol Bellamy, President of the New York City Council, in a statement to the commission underscoring the waste and inequity of the foster care system, while $281 million was spent on foster care by New York City in the last fiscal year, only $16.5 million was spent on preventive services such as would have cut short or avoided entirely any given foster care placement. These are shocking figures, more so because the continued emphasis on foster care and its side effects of tearing and keeping apart families which should be together impacts upon the mandate of this court to act as parens patriae to these children to such an extent that the very credibility of the Family Court itself is being questioned by recognized spokespersons for the disenfranchised. Quoted in the very same article, Daniel Greenberg, Esq., a respected and articulate advocate for the poor, characterizes attempts to draw a legislative line between decisions of the court and of the agencies as to a child’s future as being “like two *296 bandits arguing over who is going to get the loot.” (New York Times, supra.) These are strong remarks. One does not have to agree with them to perceive that they reflect growing doubts over the credibility of this court which must be addressed. We intend in our small way individually to meet this challenge.
“an anomaly that cries out for correction”
At this juncture it is in order to turn our attention to the very foundation of the so-called “voluntary” placement which took place here. Pertinent provisions pertaining thereto may be found in section 384-a of the Social Services Law which reads as follows:
“§ 384-a. Transfer of care and custody of children
“1. Method. The care and custody of a child may be transferred by a parent or guardian, and the care of a child may be transferred by any person to whom a parent has entrusted the care of the child, to an authorized agency by a written instrument in accordance with the provisions of this section.”
Standing out most graphically is the fact that while the law protects underage infants in commercial matters, i.e., while an infant cannot buy a television set or a stick of chewing gum without being protected by the classic defense of infancy, our Legislature, in its wisdom allows a mother who is no more than a child herself to give away — or, as in too many instances, to be talked out of her own child. The knowledge that our Legislature allows this to go on is staggering. In another context, dealing with a consent to adoption signed by a 14-year-old girl pursuant to an analogous statutory scheme, Surrogate Edward M. Horey in Matter of X (84 Misc 2d 770, 773) phrased it cogently:
“This court finds something fundamentally wrong with a jurisprudence that requires adult representation for an infant girl seeking to contract away her doll, but not her baby. Justices Cohalan and Munder in their dissent in Matter of T.W.C.'(Anonymous) (48 AD2d 893, 894) properly termined this void ‘an anomaly that cries out for correction.’
“Common sense alone dictates that a 14-year-old infant mother needs counsel and guidance on the legal aspects of *297 an issue as important as the adoption of her baby. This court is not going to proceed until she receives it.” (See, also, Matter of Anonymous, 60 Misc 2d 854; Matter of David R., 101 Misc 2d 41.)
We fully indorse the sense of outrage which prompted the remarks not only of Surrogate Horey, but those of two respected Appellate Division Justices in this department. We will not, cannot, sit by as a passive accomplice while this scenario not only takes place before us, but, making matters worse, calls upon us to award it our judicial imprimatur. Instinctively, a jurist faced with injustice, gropes consciously or otherwise, for an appropriate response. Our own is framed in terms of Schopenhaner’s On Law and Politics:
“If you start from the preconceived opinion that the concept of justice must be a positive concept and then undertake to define it, you won’t get far: you will be trying to embrace a shadow, pursuing a ghost * * * For, the concept of justice is * * * a negative concept; its content is a pure negation. The concept of injustice is the positive one. * * * It follows that the necessity for the state ultimately depends on the acknowledged injustice of the human race; without this no one would ever have thought of the state. * * * If justice ruled on earth it would be sufficient to have built one’s house: it would require no further protection than this manifest right of possession. But because injustice is the order of the day, whoever built the house must also be in a position to protect it.”
The emerging strategy therefore for any attempt to insure that justice does not elude us here must be a frontal assault on the injustice. We go forward along these lines in two ways:
1. We hold as a matter of law that where a State undertakes via its Commissioner of Social Services to act as guardian for an infant ward, that the very basis for this action, viz., the disability because of age and lack of discretion, must be held to create that “punctilio of good faith” required of every fiduciary. We judicially hold that this fiduciary obligation shall translate into a legal proposition which would preclude termination of parental rights for *298 any cause which arose during the period of disability or which may reasonably be held to flow with causality from events which occurred during the protected period of wardship.
2. As a corollary to the foregoing, we hold additionally that a so-called “voluntary” placement executed by an infant unprotected by the advice of parent or guardian ad litem is void ab initia; that any termination proceeding which may later stem from this illegitimate conception will be declared to be the fruit of a poisoned tree and disallowed. We find no bar to this course of action in the fact that review under section 385-a of the Social Services Law may have been had and judicial “approval” forthcoming. The anachronism created by the existence of sections 358-a and 392 of the Social Services Law is often too subtle to be readily perceived. The so-called “approval” of placement consents and/or surrender instruments as called for by these statutes creates no judicial proceeding, no justiciable controversy, no disposition in the classic sense. This “approval” or “review” called for by statute is an executive function properly exercised by a Commissioner of Social Services which has been thrust upon the court purely as a result of legislative dissatisfaction with the performance of the executive. To argue that this “review” or “approval” which does not rise to the level of an adjudication in the classic sense shields a tainted placement when it ripens into termination proceedings is reasoning in a circle. Our outrage, which joins that of the prominent jurists cited above, refuses to permit us the luxury of indulging in judicial sophistry to avoid coming to grips with unsettling issues of conscience.
With this background in mind, we turn to the litigation at bar in the context of New York’s termination statutes.
Two causes of action are before us, one framed in abandonment, the other in permanent neglect. The statutory scheme governing these causes of action may be found in the balance of section 384-b of the Social Services Law. It is this statute which must pass constitutional muster both on its face and in its application. Its relevant text reads:
*299 “4. An order committing the guardianship and custody of a child pursuant to this section shall be granted only upon one or more of the following grounds: * * *
“(b) The parent or parents, whose consent to the adoption of the child would otherwise be required in accordance with section one hundred eleven of the domestic relations law, abandoned such child for the period of six months immediately prior to the date on which the petition is filed in the court; or * * *
“(d) The child is a permanently neglected child”.
The terms used in subdivisions (b) and (d) are defined in section 384-b as follows:
As to abandonment: “5. (a) For the purposes of this section, a child is ‘abandoned’ by his parent if such parent evinces an intent to forego his or her parental rights and obligations as manifested by his or her failure to visit the child and communicate with the child or agency, although able to do so and not prevented or discouraged from doing so by the agency. In the absence of evidence to the contrary, such ability to visit and communicate shall be presumed.”
As to permanent neglect: “7. (a) For the purposes of this section, ‘permanently neglected child’ shall mean a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child. In the event that the parent defaults after due notice of a proceeding to determine such neglect, such physical and financial ability of such parent may be presumed by the court.”
THE ALLEGED ABANDONMENT
The heart of the abandonment statute is intent. This intent may be measured by statutory criteria which provide an objective standard of measurement. The statute *300 does not ipso facto create intent it merely measures it. Paraphrased: the statute does not mandate that abandonment be found when certain fixed criteria are met. Rather, it instructs that the court measure intent to abandon by weighing the factors delineated therein. That these factors may be met technically in a given case where no finding of intent to abandon is warranted does not, indeed, cannot constitutionally support a termination of parental rights.
Articulation of this threshold perspective may . be found in Mr. Justice Cardozo’s classic pronouncement in Matter of Bistany (239 NY 19, 24), which required parental acts “so unequivocal as to bear one interpretation and one only the parents manifested an intention to abandon the child forever.” In Matter of Maxwell (4 NY2d 429,433), the Court of Appeals again reinforced this concept in terms of “a settled purpose to be rid of all parental obligations and to forego all parental rights”. And in Susan W. v Talbott G. (34 NY2d 76), the Court of Appeals made reference to the “flicker of interest” doctrine as a bar to a finding of abandonment in denying termination based upon these grounds.
Agitation for change during the early and middle 70’s produced a legislative relaxation of the “flicker of interest” rule which made termination virtually impossible. Nevertheless, it is clear from judicial stare decisis that the basic criteria for a finding of abandonment remained unchanged (Matter of Abraham L., 53 AD2d 669).
Matter of Corey L v Martin L (45 NY2d 383) may be thought of as dispositive of the current attitude of the Court of Appeals. In that decision, Chief (then Associate) Judge Cooke put the matter into perspective when he stated in his very introductory remarks (supra, pp 386-387): “Despite recent changes in statutory law, there remains a heavy burden of constitutional magnitude on one who would terminate the rights of a natural parent through adoption.” Commenting on the statutory enactment which addressed the “flicker of interest” rule, Judge Cooke re-emphasized the very basic proposition that abandonment was and continues to be a question of intent (supra, pp 389-390):
*301 “While a determination of whether parental rights have been surrendered ordinarily involves an evaluation of factual and evidentiary material, the ultimate question is whether the submitted proof establishes abandonment as a matter of law (see Matter of Bistany, 239 NY 19, 24; Matter of Maxwell, 4 NY2d 429, 433). Stated differently, there must be legally sufficient evidence to support the determination. * * *
“The basic principles have not been abrogated (see Matter of Abraham L., 53 AD2d 669, 670; cf. Matter of Bennett v Jeffreys, 40 NY2d 543, 548, supra). In other words, the statute does not, and probably could not, mandate a conclusion that insubstantial visitation, ipso facto, constitutes abandonment, but only advises that such infrequent contact shall not be sufficient as a matter of law to preclude a finding by the court.” (Emphasis added.)
In Matter of Wesley L. (72 AD2d 137,143), the Appellate Division, First Department, reiterated this principle: “The mere absence of visitation or contact with Wesley for a period of six months preceding the hearing is in itself insufficient to establish abandonment. Inquiry must be made into the question of whether the failure occurred without good reason”.
The fact that an intent to abandon parental responsibility must be proven by reference to outward manifestations thereof requires that we assess respondent mother’s efforts to establish herself as a viable resource for care of her child. This assessment may be found in the context of her background prior to the time in question and subsequent thereto (Matter of Wesley L., supra).
We find that this special young woman has met every one of life’s challenges with a firm resolve to get on her feet and care for her child. She has done so in spite of every possible obstacle, in spite of the commissioner’s dismal failure to meet his statutory responsibilities to his ward to keep her united with her child (Social Services Law, § 384-b, subd 1, par [a], cl [ii]). The crucial statutory element of intent to abandon has not been established. On the contrary, the court notes a continuing determination on her *302 part to prevail over these obstacles and to meet her parental responsibilities.
In commenting on similar factors relating to “kicking” a drug habit, the First Department commented in Wesley L. (supra, p 142): “such activity, undertaken in the context of establishing fitness to obtain the return of Wesley, is most laudable. The difficulty of withdrawing from and denying to one’s self the drug to which one is addicted cannot be underestimated. Motivation and courage are required to succeed in overcoming an addiction to drugs, and insofar as that motivation and courage proceed not only out of self-interest, but in response to a parent’s love for his child, they generate compassion and respect. To those who do not have the ‘monkey’ of drug addiction ‘on their backs,’ the reality of the effort of will and physical endurance required to take that ‘monkey off one’s back’ is sometimes underestimated and not accorded the reasoned and dispassionate recognition that undertaking such effort is itself laudable, and intermittent failure should be held of little or no account provided the process of self-rehabilitation is not abandoned”.
Whether we apply the newly required clear and convincing standard of proof (cf. Santosky v Kramer, _.US_) retroactively or the preponderance standard in effect at the time of this trial, we find no hint of abandonment. Turning to the alternative cause of action in permanent neglect, we find no failure to plan; no unjustified failure to visit; no encouragement or diligent efforts on the part of the agency; no showing that visitation with the mother would fail to serve the best interests of the child in question. Regardless of the standard of proof, both causes of action have failed in their proof.
THE LAW GUARDIAN
The importance of the Law Guardian’s stance in litigation of this nature cannot be overemphasized (Matter of Ray A.M., 37 NY2d 619, 624; Matter of Orlando F., 40 NY2d 103, 112; Matter of Wesley L., 72 AD2d 137, supra). We have afforded to the position of the Law Guardian that great weight and respectful consideration which these cases require of us. That position coincides in every way possible with that of the court.
*303 DISPOSITION
We áre persuaded beyond any doubt that both causes of action must be dismissed. The Family Court has wide ranging powers with respect to proceedings before it. The court may order that proceedings be brought returnable before it; may consolidate proceedings pending elsewhere; and may review a foster care situation on its own motion (Matter of Sanjivini K., 40 NY2d 1025). We elect to use all these powers so recognized by the Court of Appeals.
The Commissioner of Social Services is responsible for the support and maintenance of the respondent mother as an adult receiving public assistance just as he was responsible for her to an even greater degree when she was a neglected child. It is in his name with authority derived from his statutory responsibility that the petitioning agency has acted throughout. The best interests of this infant would appear to be served by uniting her with her mother. (Social Services Law, § 384-b.) The Commissioner of Social Services is accordingly directed to show cause on the return date, why he should not be added as a party (CPLR 1002) and why he should not, in the event return of the child is ordered, provide aid in locating and/or approve adequate housing and financial support for the united family pursuant to section 255 of the Family Court Act (cf. Matter of Chrystol B., 104 Misc 2d 888). The petitioning agency is directed to show cause on the adjourned date why the court should not on its own motion, review the placement of the subject infant (Social Services Law, § 392) and after review thereof, order her forthwith return to respondent mother upon compliance by the commissioner with any directives the court shall make pursuant to section 255 of the Family Court Act (Social Services Law, § 392).
The clerk shall effectuate mail service of this order to show cause upon the commissioner and upon the petitioning agency no later than 15 days prior to the return date herein.

. Quoting from the petition for first review pursuant to section 392 of the Social Services Law (Docket No. K.6083/77), paragraph 6 reads as follows: “our plan is for continued intensive casework with the mother with a view, among other things, to mutually plan for Tricia to be adopted.” (Emphasis added.)

. On March 24, 1982, the Supreme Court of the United States handed down its decision in Santoski v Kramer (_ US _), which struck down New York State’s preponderance of evidence standard for termination of parental rights in favor of an evidentiary standard of clear and convincing proof. The cases cited above were the same cases cited to the Supreme Court in support of the argument which ultimately prevailed. The dual impact of this holding in no way changes the result herein. First, in underscoring the proposition that the integrity of the family is a constitutionally protected right, it bolsters the ultimate decision herein. Second, as will be pointed out herein, we find no need to wrestle with the question of Santoski’s retroactivity since we hold herein that even a burden of proof by preponderance has not been met.