In the Matter of A. F., Petitioner, v SPENCE CHAPIN AGENCY, Respondent.

Family Court, Kings County, January 20, 1989

APPEARANCES OF COUNSEL

*Jay C. Shoulson* for petitioner. *Simpson, Thatcher & Bartlett (Mary Elizabeth McGarry* of counsel), for respondent. *Milburn & Ackerman (Terry Milburn* of counsel), for birth mother, intervenor. *Beilenson, Rosin & Reineger (Benjamin James Rosin* of counsel), for Anonymous and another, intervenors. *Robert Abrams, Attorney-General (Robert J. Schack* of counsel), for State of New York.

## OPINION OF THE COURT

Sara P. Schechter, J.

Petitioner in the custody case before the court is the 16-year-old father of an out-of-wedlock infant, to whose adoption he consented. The baby was also surrendered for adoption by the biological mother (hereinafter by the appellation of her choosing, birth mother). The birth mother, also a teen-ager, does not seek to revoke her surrender. On the contrary, her position in the litigation was entirely supportive of the respondent in the proceeding, Spence Chapin Services for Families and Children (hereinafter the agency), an authorized adoption agency, which placed the baby for adoption and vigorously opposes removal of the child from the preadoptive home. Petitioner's paternity of the infant was adjudicated on admission of the birth mother in a companion case filed subsequent to the custody petition. The preadoptive parents were granted leave to intervene in the custody proceeding.

■ The case raises several issues: first, whether the consent of the father to the child's adoption is valid, in light of the father's age and the circumstances under which the consent was executed; second, whether the father's consent to this child's adoption is statutorily or constitutionally required; and third, if the father's consent be not required, whether he nevertheless retains standing to petition for the child's cus-

tody, and if so, what standard the court should apply. We hold that the father's consent to the adoption was not valid, that the father's consent was not required, that the father retained standing to petition for custody, and that the court must apply the best interest of the child standard in the adjudication, without any presumption in favor of the father.

I

The infant subject of the proceeding was born on December 27, 1987. On January 6, 1988 petitioner executed a consent to the adoption of the child, and the birth mother at the same time executed a surrender for adoption, which by its terms vests custody and guardianship of the child in Spence Chapin Services to Families and Children. The baby was placed for adoption on January 8, 1988.[1]

The execution of the consent and surrender documents took place at the birth mother's home. Both of the young natural parents were present, along with the mother of the birth mother, a friend of the mother's mother, and two members of the agency's social work staff. Petitioner claims that he went to the birth mother's home that evening only because the birth mother told him that if he failed to show up her mother would tell his mother about the birth of the baby. Petitioner had totally concealed the pregnancy from his family, and, by his own admission, he intended to continue to do so. When he got home after signing the consent, however, he was so upset that his mother noticed and prodded him with questions, whereupon he broke down and told her all that had happened. She contacted the agency, and after a meeting at the agency on January 12, 1988, petitioner commenced the present proceeding on January 19, 1988.

■ Petitioner's testimony concerning his resistance to going to the meeting with the Spence Chapin workers lacks credibility. Petitioner himself testified that he knew weeks before the birth that the birth mother intended to give the baby up for adoption, and he had discussed the plan with a friend of the birth mother. He also acknowledged knowing a week in advance that January 6 was the date set for the signing of papers. He had ample time to decide whether to appear at the meeting. Moreover, the alleged "threat" to tell his parents, if

---

1. Petitioner's use of a custody proceeding as a vehicle to revoke his consent was not challenged and is not unprecedented. (See, Anonymous v Anonymous, 108 Misc 2d 1098 [Sup Ct, Queens County 1981].)

it was said at all, was not so fear-inspiring as to override the exercise of petitioner's free will. We conclude, therefore, that no duress or coercion was used to secure petitioner's presence at the birth mother's home on the evening when the documents were signed.

■ We turn our attention to the circumstances of the actual execution of the consent. The fact that petitioner was only 16 years old at the time is a factor which must be carefully considered. The statute pursuant to which petitioner's consent was taken does not specifically address the issue of the execution of a consent by a minor father. (Domestic Relations Law § 111 [2] [e].) Since the consent of a qualified father is required under Domestic Relations Law § 111 (1) (e) regardless of whether the father is adult or infant, it appears that the statute does contemplate that a minor father of an out-of-wedlock child can consent to his child's adoption. This interpretation is consistent with the fact that it is settled law that a minor mother may execute a surrender of her child for adoption pursuant to section 384 of the Social Services Law. *(Matter of T. W. C.,* 38 NY2d 128 [1975]; *People ex rel. Skokas v McCarthy,* 7 Misc 2d 963 [Sup Ct, NY County 1957].)

Although the statutory scheme does not distinguish minors as a class, it does not follow that petitioner's youth is unimportant in deciding the voluntariness of his consent. The courts of this State exercise special care in assuring that the interests of minors are well protected. Such heightened concern stems from the recognition that the minor's disability due to age and lack of discretion renders him incapable of fully protecting his own interests.

Several courts have noted the awesome, and somewhat anomalous, magnitude of the burden which our statutory scheme lays on the shoulders of a minor parent. The Surrogate in *Adoption of X* (84 Misc 2d 770, 773 [Sur Ct, Cattaraugus County 1975]) wrote:

"This court finds something fundamentally wrong with a jurisprudence that requires adult representation for an infant girl seeking to contract away her doll, but not her baby * * *.

"Common sense alone dictates that a 14-year-old infant mother needs counsel and guidance on the legal aspects of an issue as important as the adoption of her baby." *(Also see, Adoption of Burnadette L. C.,* 115 Misc 2d 78 [Sur Ct, Bronx County 1982].)

Similarly, in *Matter of Tricia Lashawnda M.* (113 Misc 2d

287, 296 [Fam Ct, Queens County 1982]), the court was equally critical of permitting a minor to sign a "voluntary" foster care placement agreement pursuant to Social Services Law § 384-a; "[W]hile the law protects underage infants in commercial matters, i.e., while an infant cannot buy a television set or a stick of chewing gum without being protected by the classic defense of infancy, our Legislature, in its wisdom allows a mother who is no more than a child herself to give away—or, as in too many instances, to be talked out of her own child. The knowledge that our Legislature allows this to go on is staggering."

■ The tone of these decisions serves to remind us of the need for the highest degree of care in fully informing and emotionally supporting a minor parent through every phase of the surrender process. Certainly it is highly desirable that a minor parent have the assistance of a trusted adult at such a time, and petitioner's misguided refusal to turn to his own parents placed an added burden upon the agency. Although the agency by no means "railroaded" petitioner, as he contends, they did fail to exercise the extraordinary care demanded in dealing with a minor who lacks the assistance of a parent or guardian. Rather, they proceeded as they would with an adult parent, and failed to make allowances for a teen-ager's mix of impulsiveness and self-righteousness, need and know-it-all.

The night petitioner signed the consent was the first meeting between petitioner and any social worker concerning planning for the child. Although petitioner had declined to contact the agency while the birth mother was at Inwood House, he did appear for the meeting at the birth mother's house, and that meeting could have, and should have, had a much broader agenda than the mere execution of the consent form. It should have begun with a discussion of the planning alternatives available to petitioner and should have encompassed a full explanation of his legal rights, including the right to consult an attorney and the right to take a copy of the document home with him to reread it and reflect upon it prior to signing. *(Janet G. v New York Foundling Hosp.*, 94 Misc 2d 133 [Fam Ct, NY County 1978].)* Although the court fully credits the testimony of the agency witnesses that the document was read to petitioner line by line and finds as fact that petitioner did understand that by signing the document he would be giving the child up for adoption, nevertheless petitioner's consent cannot be held to be knowing and volun-

tary in the absence of some showing that he had been made aware of the options open to him. The social worker's attempt to draw petitioner out by asking him to discuss the profile of the adoptive parents does not substitute for an effort to find out how he felt about the proposed adoption itself.

On one aspect of the consent the court finds that petitioner was genuinely confused; petitioner at the time of signing the consent believed that he had 30 days in which to change his mind. He believed that because he heard one of the social workers tell the birth mother that her surrender was revocable within 30 days, and he assumed the same applied to him. No one explained to him that, unlike the mother's surrender, his consent was irrevocable under Domestic Relations Law § 111 (2) (e), nor does the consent instrument itself so state. The fact that petitioner has actually been granted a revocation hearing, notwithstanding the statutory language, does not cure his misunderstanding at the time of the execution of the consent, which materially influenced his willingness to sign the document.

The fact that the agency did not actively mislead petitioner, that its errors were of omission rather than commission, is not dispositive. Although the Court of Appeals has held that mere mistake is insufficient grounds for invalidating a consent in the absence of some misstatement by the person offering the document to be signed (*Matter of Sarah K.*, 66 NY2d 223 [1985]), this court does not understand that language to establish an active/passive distinction, but rather to restate the already established objective/subjective distinction. In other words, the mere fact that petitioner actually was confused does not vitiate his consent, but the fact that the agency conducted the meeting in such a fashion that there was a substantial likelihood of a person of petitioner's age and circumstances becoming confused or pressured does invalidate his consent.

The agency's rather summary handling of petitioner contrasts with their sensitive and respectful dealings with the birth mother. Although petitioner contends that this disparity indicates that the agency takes fathers less seriously than mothers, there is no evidence before the court to support such an assertion. There was ample basis in petitioner's conduct for the agency's assumption that petitioner had no real interest in the baby, and that the execution of the consent was a formality which he was eager to have over and done. However, assumptions, even reasonable assumptions, cannot pro-

vide the foundation for a transaction whereby a 16 year old, without advice of parent, guardian or counsel, gives up all rights to his child.

## II

■ We now turn our attention to the question whether petitioner's consent to the adoption is required.[2] Section 111 (1) (e) of the Domestic Relations Law requires the consent of an out-of-wedlock father of a child under six months of age at the time of placement for adoption only if (1) the father lived with the child or the child's mother for six months immediately preceding the adoptive placement and (2) the father openly held himself out to be the father while living with the child or child's mother and (3) the father paid a reasonable sum, in accordance with his means towards the medical expenses incurred in connection with the pregnancy and birth. Even if these prerequisites were disjunctive, petitioner would not qualify as a father whose consent is required, as it is essentially undisputed that he has not done any 1 of the 3. During the pregnancy petitioner was a high school student living at home with his own parents, he told only a few close friends of his impending fatherhood and, as previously discussed, deliberately concealed the pregnancy and the birth of the baby from his parents. He made no contribution whatsoever towards the birth expenses and made only minimal loans or gifts of money to the mother during the pregnancy. Although petitioner claims that he proposed marriage to the birth mother and suggested that they live together at his parents' home, the insincerity of this proposal was apparent in view of petitioner's adamant refusal even to tell his parents of the pregnancy.

■ Petitioner asserts that Domestic Relations Law § 111 (1) (e) is unconstitutional.[3] The constitutionality of this statute has been upheld by the Appellate Division, Second Department *(Matter of "Female" D.,* 83 AD2d 933 [2d Dept 1981]; *Matter of Michael Patrick C.,* 83 AD2d 932 [2d Dept 1981]). It appears that the primary thrust of petitioner's argument to this nisi prius court is that the statute is unconstitutional as

2. [2] The court rejects petitioner's argument that by seeking his consent the agency has conceded that it is required. There are very good legal and social work reasons for an agency to err on the side of caution in such a situation.

3. The Attorney-General was notified and has intervened in support of the statute.

applied to him. He contends that the statute deprives him of equal protection and due process of law in that he, as a dependent minor, was unable to fulfill the statutory requirements. The plight of the truly helpless or unknowing father is one which troubled some who commented upon the bill enacting this statute,[4] and such a case will undoubtedly reach an appellate court sooner or later.[5] Petitioner herein, however, was neither helpless nor unknowing. By his own testimony, he was aware of the pregnancy from about the fourth month, and he did none of the things which were well within his power to assert his interest in the child. Any serious attempt to assist the birth mother or to plan for the child would have had to begin with petitioner's seeking the advice and help of a parent or another trusted adult. Instead, he confided only in a few chums whose experience of the world was as limited as his own, but whose judgment was apparently better, in that even they advised him to tell his parents. Neither did petitioner take the obvious step of looking for a part-time job to help out financially. The birth mother, by contrast, held both after-school and summer jobs. Petitioner did not choose to be involved in the planning for the child while the birth mother was at Inwood House maternity shelter and, in fact, did not even visit the birth mother during the weeks that she was there. Finally, he did not forthrightly and consistently declare to the birth mother his desire to raise the child. On the contrary, he took the approach that the pregnancy was her problem and that he would not interfere in whatever she decided to do about it. He certainly gave no indication that he was prepared to inconvenience himself in the slightest for the sake of establishing a relationship with the child. Such a course of conduct does not manifest a significant paternal interest recognized by *Caban v Mohammed* (441 US 380 [1979]) and its progeny *(Lehr v Robertson,* 463 US 248 [1983]; *Matter of Michael Patrick C.,* 83 AD2d 932, *supra),* as entitled to constitutional protection.

## III

The conclusion that petitioner's consent to the child's adoption is not required raises the issue of whether he has any standing to pursue custody. The agency contends that as it

4. Memorandum in opposition to Senate Bill 9768-B from South Brooklyn Legal Services Corporation B, June 24, 1980.

5. *See, Matter of Baby Girl S.,* 141 Misc 2d 905.

has a valid surrender instrument from the one parent whose consent to adoption is required, there is no custody question before the court. Petitioner, on the other hand, contends that he can petition for custody of the child until his parental rights are terminated by adoption or by a proceeding pursuant to section 384-b of the Social Services Law, and that in deciding custody the court must presume that the child's best interest will be served by being raised by a biological parent, absent a showing of unfitness of the natural parent.

As no statutory authority nor judicial decision on point has been found, we must attempt to reason by analogy, taking our bearings from the over-all New York statutory scheme covering consents for adoption. Logically, the fact that petitioner's consent is not required should put him on an equal footing with a parent who has executed a valid consent to adoption. As discussed above, Domestic Relations Law § 111 (2) (e) states that the duly executed consent of a father of an out-of-wedlock child "shall be irrevocable," whereas a duly executed surrender by a mother or in-wedlock father pursuant to Social Services Law § 384 (5) may by its terms be made irrevocable only after 30 days have elapsed since execution of the surrender and the child has been placed in an adoptive home. Since the agency agreed to petitioner's having his revocation hearing, the issue of the validity of the distinction as to the revocability of the two types of parent consents for adoption is not before the court, but it must be noted that the present proceeding was initiated 13 days after the mother's surrender was executed and less than one month after the birth of the child. The agency's interpretation would preclude every father who has failed to fulfill the statutory requirements prior to birth from never seeking custody of an infant placed for adoption shortly after birth, a position which impresses this court as overly broad.

Petitioner's view of the applicable adjudicatory standard, on the other hand, would put petitioner in a better position than an in-wedlock parent seeking to revoke a duly executed surrender instrument. Social Services Law § 383 (6) states: "In an action or proceeding to determine the custody of a child surrendered for adoption and placed in an adoptive home or to revoke or annul a surrender instrument in the case of a child placed in an adoptive home, the parent or parents who surrendered such child shall have no right to the custody of such child superior to that of the adoptive parents, notwithstanding that the parent or parents who surrendered the child are fit,

competent and able to duly maintain, support and educate the child. The custody of such child shall be awarded solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular custodial disposition."

This standard is the one which is most consistent with petitioner's actual standing in the litigation.

Evaluating petitioner's request for custody by the standard set forth in Social Services Law § 383 (6) there can be no question that the infant's best interest will be served by his adoption by the preadoptive couple. Petitioner by himself has nothing to offer a child. He has dropped out of high school, does not hold even a part-time job, and is pursuing a GED in a desultory fashion. He was a discipline problem at school and has had minor brushes with the law. Even more significant is petitioner's striking emotional immaturity; he has demonstrated no capacity to nurture, or even to consider the needs of another human being. Petitioner's self-absorption, empty bravado and tunnel vision appear quite entrenched in his personality and cannot be explained away entirely as deficits of his youth. The birth mother, for example, who is the same age as petitioner, demonstrated a much more highly developed ability to conceptualize the needs of a small child and to recognize her own unpreparedness to meet those needs.

Petitioner actually is a fairly minor figure in his own child care plan, however. The primary proposed caretaker, and apparently the prime mover in initiating the custody proceeding, is petitioner's mother. Petitioner's grandmother, a warm and kindly lady, has also offered her assistance. Although there is no indication that the baby would be neglected if raised by petitioner's family, the family is dysfunctional in ways which bear directly upon their parenting capacity. Both petitioner and his older brother have manifested serious adjustment problems in adolescence, which petitioner's mother tends to minimize. There appears to be little meaningful communication among family members, and petitioner's father, who works at night and sleeps during the day, seems particularly remote. He took no part in the custody litigation. As petitioner described it to the birth mother, his home is a tense and joyless place, which he avoids as much as possible.

The preadoptive couple, having been approved by the agency, would be expected to be more than adequate parents, and in fact they measure up in every respect—good educa-

tions, good jobs, lovely home. They have a special quality which is more than we could have expected, however, and that is their extraordinary empathy and compassion for the birth parents of the child they are raising. In spite of their strain while testifying, the preadoptive parents were neither resentful nor patronizing of the birth parents. They were also exceptionally able to perceive the child as an individual with his own tastes and talents worthy of respect.

For the reasons stated herein the custody petition is denied. The stay of adoption proceedings which has been in effect during the proceeding is extended 45 days from the date of this decision and order, or until the Appellate Division rules on a stay application, whichever occurs sooner.

The court wishes to thank all counsel in this proceeding for their diligence, courtesy and professionalism in this difficult and emotionally charged matter.